**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIAM NOVAK,**

                                      **Plaintiff,**

             **v.**                                                 **5:05-CV-199**
                                                                         **(FJS/GJD)**

**BOARD OF EDUCATION OF THE**
**FAYETTEVILLE-MANLIUS CENTRAL**
**SCHOOL DISTRICT; FAYETTEVILLE-**
**MANLIUS CENTRAL SCHOOL DISTRICT;**
**and JUDITH CLARKE, in her capacity as**
**Director of Transportation,**

                                      **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES** | **OF COUNSEL** |
| **MELVIN & MELVIN, PLLC** | **FRANK J. VAVONESE, ESQ.** |
| 217 South Salina Street | **ELIZABETH GENUNG, ESQ.** |
| Seventh Floor | **ROGER W. BRADLEY, ESQ.** |
| Syracuse, New York 13202 | |
| Attorneys for Plaintiff | |
| | |
| **LAW FIRM OF FRANK W. MILLER** | **CHARLES E. SYMONS, ESQ.** |
| 6575 Kirkville Road | **FRANK W. MILLER, ESQ.** |
| East Syracuse, New York 13057 | |
| Attorneys for Defendants | |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff commenced this action on February 14, 2005, asserting eleven claims against

Defendants for allegedly taking disciplinary action against him based on his involvement in

union-organizing activities.  Plaintiff subsequently withdrew six of his causes of action.

Thereafter, the Court granted summary judgment to Defendants on all remaining claims with the

exception of Plaintiff's First Amendment retaliation claim and a related New York constitutional

free speech retaliation claim, finding that genuine issues of material fact existed.  *See*

Memorandum-Decision and Order, dated March 14, 2007, at 18.

The Court conducted a six-day bench trial on these remaining claims beginning on

September 24, 2007, and concluding on October 1, 2007.  Based on the credible evidence

received at trial, the following constitutes the Court's Findings of Fact and Conclusions of Law in

accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff has been employed as a bus driver for the Fayetteville-Manlius Central School

District ("District") since 1994.[1]  *See* Trial Transcript ("Tr.") volume 2 at 2.  As stated, Plaintiff

contends that Defendants retaliated against him for exercising his right to free speech under the

First Amendment to the United States Constitution and Article I, § 8 of the New York

Constitution.

In order to succeed on a First Amendment retaliation cause of action, a plaintiff must

demonstrate by a preponderance of the evidence that (1) his speech was constitutionally

---

[1] Since Plaintiff became a full-time driver in late 1995 or early 1996, his duties have included six bus runs each school day.  *See* Tr. volume 2 at 3, 8.  About three years ago, Plaintiff was assigned a seventh bus run to transport kindergartners.  *See id.* at 9.  Plaintiff completes three morning runs between the hours of 6:50 a.m. to 9:00 a.m.  *See id.* at 7.  He then completes his kindergarten run between 11:15 a.m. and 1:00 p.m.  *See id.*  His final three runs begin at 1:45 p.m.  *See id.* at 8.  During the period at issue in the present case, except for his five-day suspension in 2004, Plaintiff's bus run schedule did not change.  *See id.* at 137-38.

protected, (2) he suffered an adverse employment action, and (3) a causal connection exists between his speech and the adverse employment determination against him.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-88 (1977); *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (citation omitted).  The defendant may then defeat the plaintiff's case by showing that it would have taken the same action regardless of the protected conduct.  *See Mt. Healthy*, 429 U.S. at 287.  However, if the defendant cannot show by a preponderance of the evidence that it would have taken such an action in the absence of the protected speech, the court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).[2]

The "speech" that Plaintiff maintains was constitutionally protected involves two different incidents of expression.[3]   The first concerned his appearance as a witness at a New York State Public Employment Relations Board ("PERB") hearing, and the second concerned a

---

[2] The New York Constitution provides free speech retaliation protections analogous to those under the United States Constitution; therefore, the same standards apply.  *See Burns v. Cook*, 458 F. Supp. 2d 29, 38 n.3 (N.D.N.Y. 2006) (citation omitted).

[3] Plaintiff does not set forth a freedom-of-association or hybrid speech/association claim in his pleadings.  At the beginning of trial, Plaintiff reaffirmed that he was not making an associational claim.  *See* Tr. volume 1 at 5.  Nevertheless, in addition to alleging that his PERB-hearing testimony and sheep story constitute protected speech, Plaintiff's complaint appears to contain vague references to other "protected speech."  *See* Complaint at ¶ 40.  At the trial's conclusion, Plaintiff's counsel suggested that this "protected speech" refers to Plaintiff's May 5, 2003 confrontation with Ms. Clarke in her office.  *See* Tr. volume 6 at 58.  Since Plaintiff has not offered any evidence that he was acting on behalf of a union faction or promoting unionization during this confrontation, this speech does not raise a public concern.  Therefore, it is unnecessary to decide whether Defendants were afforded fair notice of this claim.

-3-

story he told to co-workers that he claims related to union-organization efforts, hereinafter

referred to as the "sheep story."  The Court will address each incident separately.


A.      **Plaintiff's PERB-hearing testimony**

Some time in 1999 to 2000, Plaintiff became involved with a group of fellow employees,

including his friend Richard Griffith, who sought to replace the existing bargaining unit, the

Fayetteville-Manlius Transportation Association ("Association"), with a larger and more

independent union.  *See* Tr. volume 2 at 10-16.  The existing Association was not connected to

any outside organization.  Eventually, two factions arose within Defendant District's

transportation department that were bitterly divided over the issue of whether the transportation

employees should pursue outside union representation.   *See* Tr. volume 1 at 96.

On May 6, 2003, at 10:00 a.m., Plaintiff testified on behalf of Mr. Griffith at a hearing

before the PERB concerning an "improper practice" charge Mr. Griffith had brought against

Defendant District.  *See* Tr. volume 2 at 17-18.  In essence, Plaintiff testified at the PERB

hearing that he had observed anti-union literature posted in the transportation department office.

*See id.* at 19-20.  Plaintiff claims that, as a result of this testimony, Defendants took a series of

adverse employment actions against him.  *See id.* at 5-6.

Adverse employment actions include, among other things, suspension from work and

reprimand.  *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (quoting [*Morris*, 196 F.3d

at 110]).  A continuing pattern of harassment may also constitute an adverse employment action

if it would deter a person of average firmness from exercising his right to speak.  *See id.*  A

plaintiff may demonstrate causation only if "the protected speech was a *substantial motivating*

*factor* in the adverse employment action . . . ."  *Morris*, 196 F.3d at 110 (emphasis added).

The first alleged adverse employment action occurred on May 7, 2003, when Defendants granted Plaintiff a paid personal day instead of a paid sick day for his absence the previous day. On the morning of May 6, 2003, the date of the PERB hearing, Plaintiff called the transportation department office and reported to a dispatcher that he would not be coming to work that day.  *See* Tr. volume 2 at 36.  The next day, on May 7, 2003, Plaintiff spoke with Judith Clarke, director of the transportation department, about his absence.  *See* Tr. volume 4 at 261.  He asked Ms. Clarke to mark him down for a sick day; however, Ms. Clarke refused and issued him a paid personal day.  *See id.* at 255.  She stated that the reason for her decision was that it was apparent to her that Plaintiff had taken the day off for the purpose of testifying at the hearing because she had seen him at the May 6, 2003 PERB hearing and did not think he looked ill.  *See id.* at 254.

At trial, Plaintiff maintained that he had taken pain medication for a back condition that prevented him from operating a school bus; however, he did not mention this fact to the bus dispatcher on the morning of May 6, 2003.  *See* Tr. volume 2 at 120-21.  Moreover, he saw Ms. Clarke at the PERB hearing on the day that he was absent from work but did not tell her until the next day that he could not perform his duties because he had taken pain medication.  To Ms. Clarke, Plaintiff appeared in sound health and was able to testify at the hearing without issue. Assuming for sake of argument that Plaintiff's testimony at the PERB hearing was protected and that the refusal to grant him a sick day was an adverse employment action, the credible evidence does not support a finding that his testimony was a substantial motivating factor in Ms. Clarke's decision.

The second alleged adverse employment action occurred when Defendants issued Plaintiff a letter of reprimand, dated May 22, 2003, citing his inappropriate and disrespectful behavior at meetings with Ms. Clarke on May 5, May 7, and May 21, 2003.  *See* Plaintiff's Exhibit "22."  The letter of reprimand included Plaintiff's outburst on May 7, 2003, after Ms. Clarke denied his request for a sick day.  *See id.*  At that meeting, Plaintiff became angry and confrontational when Ms. Clarke stood fast in her refusal to grant him the sick day.  *See* Tr. volume 4 at 255.  However, this was not the first time Plaintiff had argued with her.  On May 5, 2003, Ms. Clarke held a meeting in her office to discuss an issue that Plaintiff had raised concerning the pay rate for retired drivers returning to work as substitutes.  *See* Tr. volume 2 at 252.  In attendance were Plaintiff, bus driver Richard Crolick, Ms. Clarke, and a group of other bus drivers who comprised an informal labor relations committee that Ms. Clarke had formed. *See id.*  Ms. Clarke and her informal committee were not in agreement with Plaintiff on the issue, *see id.* at 28-31; and, after a few minutes of discussion, Plaintiff raised his voice and stormed out, *see* Tr. volume 4 at 252*.*

Plaintiff had another verbal altercation with Ms. Clarke in her office on May 21, 2003. *See id.* at 257.  The subject of the meeting was Plaintiff's failure to follow procedure in reporting damage to a brake light on his bus.  *See id.* at 74-75.  At the meeting, Ms. Clarke and Leslie Gillett, head mechanic at the transportation department, admonished him.  *See id.* at 257. Although Plaintiff did not use offensive or abusive language, *see id.* at 87-88, he raised his voice at Ms. Clarke and engaged in a heated argument with Mr. Gillett, *see id.* at 76, 78-79.

At trial, Plaintiff admitted that he argued with Ms. Clarke at the meetings at issue and walked out of the meeting held on May 5, 2003.  *See* Tr. volume 2 at 30-31, 38; Tr. volume 3 at

10, 12.  He also admitted that these meetings were convened for purposes other than his PERB-

hearing testimony.  *See* Tr. volume 2 at 24, 38; Tr. volume 3 at 6.  Based on the credible

evidence, Ms. Clarke had legitimate cause to issue Plaintiff a letter of reprimand for his

outbursts, two of which took place in front of other transportation department employees.  As

such, the Court finds that Plaintiff's PERB-hearing testimony was not a "substantial motivating

factor" in Ms. Clarke's decision to issue the letter.  Since Plaintiff has not proven causation, his

PERB-hearing testimony cannot form the basis for a First Amendment retaliation claim.


**B.**     **The sheep story**

       On October 30, 2003, Plaintiff encountered bus drivers Randy Agans, Linda Robinson,

and Kim Bandrosky after work in the employee parking lot.  *See* Tr. volume 3 at 58-59, 63-64;

Plaintiff's Exhibit "38" at 5.  At that time, Ms. Robinson was president of the Association.  *See*

Tr. volume 4 at 9.  She and Plaintiff did not get along.  *See id.*  Plaintiff told Ms. Robinson that

he had a story to tell her and asked her not to interrupt him.  *See* Plaintiff's Exhibit "38" at 6.

The following is the sheep story as Ms. Robinson remembered it:

>             We are a flock of sheep all grazing together each day.  Some sheep
>      like to eat with each other, some eat alone, and some don't even go
>      near each other, but that's OK.  We are still one flock.  Now it
>      seems we have a wolf watching our flock and this wolf seems to be
>      picking us off one by one!  Some sheep believe this wolf is the
>      administration, some believe the wolf is called Judy, and some may
>      think the wolf are [sic] the parents; either way the wolf sweeps in
>      and gets one of our flock every so often.  The flock just stands
>      around and shivers — just glad that the wolf didn't get them this
>      time.  They just continue to graze like they do each day, but they
>      wonder who will be next[.]  Some believe the flock should band
>      together as one to fight the wolf and perhaps to kill it[.  O]nly then
>      will the flock finally be safe and happy.

*Id.* at 4-5.  Plaintiff had told Mr. Agans a similar version of this story on October 18, 2003.  *See* Tr. volume 3 at 53-54.  In all, Plaintiff told the sheep story in some form about sixty times to various people between late 2001 and 2005.  *See id.* at 55, 58.

The story distressed Ms. Robinson.  *See* Tr. volume 4 at 7, 9.  She observed that Plaintiff was very angry and felt that some of his anger was directed toward her.  *See id.* at 9.  The next day, Ms. Robinson e-mailed the story as she remembered it to Ms. Clarke.  *See id.* at 10.  Ms. Clarke forwarded the email to personnel supervisor Mary Ellen Vaillancourt, who in turn forwarded the email to business director Robert Nickerson.  *See id.* at 185, 188.  Mr. Nickerson reported the incident to superintendent of schools Dr. Philip Martin.  *See* Tr. volume 3 at 112. Dr. Martin observed that Mr. Nickerson was distraught by the story.  *See id.*  Dr. Martin directed Mr. Nickerson to conduct an investigation into the matter.  *See id.* at 112-13.

Defendants hired private investigation firm AMRIC Associates Ltd. to conduct inquiries into the sheep-story incident.  *See* Plaintiff's Exhibit "38" at 2.  AMRIC associate John Winslow conducted the investigation.  *See id.*  Defendants also hired Garry Luke, a private labor relations consultant, to assist in the investigation.  *See id.*  Mr. Winslow and Mr. Luke interviewed Plaintiff and five of his co-workers, Ms. Robinson, Mr. Agans, David Toms, Tammy Duda, and Myron Sayre, all of whom Plaintiff had told the sheep story.  *See id.*  Mr. Winslow then issued a report detailing his investigation and conclusions.  *See* Plaintiff's Exhibit "38."  Mr. Winslow also testified at trial that, while it was unlikely that Plaintiff posed a threat at the time he related the sheep story to his fellow employees, he exhibited several characteristics that were troublesome and could at some time lead to violence.  *See* Tr. volume 3 at 163.  He observed that

Plaintiff had an argumentative nature, had a history of making direct or veiled threats, had an obsessive involvement with his job, and was sensitive to criticism.  *See id.*  Mr. Winslow also testified that the sheep story was upsetting to some drivers and disruptive in the workplace.  *See id.* at 165.  In Mr. Winslow's opinion, the bus drivers whom the story upset were not overreacting.  *See id.* at 169.  Based on Mr. Winslow's written report and Mr. Luke's oral report, Ms. Clarke issued Plaintiff a letter, dated February 13, 2004, notifying him that he was to be suspended for five days without pay as a result of his discourteous and inappropriate behavior in telling the sheep story.  *See* Plaintiff's Exhibit "44."  The letter also stated that Plaintiff lied when he told the investigators that he did not use the term "kill" when telling the story.[4]  *See id.*

        Free speech jurisprudence recognizes the dual nature of the government employee.  On one hand, he is a private citizen who may address "matters of public concern" under the protection of the First Amendment.  *Connick v. Myers*, 461 U.S. 138, 147 (1983).  On the other hand, he is a representative of the government; and, in his capacity as a government employee, he derives no First Amendment protection from addressing "matters only of personal interest."  *Id.*  A statement is a matter of public concern when it relates to "political, social, or other concern to the community."  *Id.* at 146.  The court can determine whether a statement addresses a matter of public concern by looking at the statement's content, form, and context.  *See id.* at 147-48.  The speaker's motive is relevant to whether there is a public concern, although it is not dispositive.  *See Reuland v. Hynes*, 460 F.3d 409, 417-18 (2d Cir. 2006) (quotation omitted).

---

        [4] Although the AMRIC report did not state whether Plaintiff used the word "kill," Mr. Luke concluded in his oral report to Mr. Nickerson, Ms. Vaillancourt, and Ms. Clarke that Plaintiff used the word "kill" and lied when he denied it in his interview.  *See* Tr. volume 4 at 107.  At trial, Mr. Winslow also testified that he believed Plaintiff used the word "kill" when telling the sheep story.  *See* Tr. volume 3 at 175.

In general, union activity and efforts to unionize are matters of public concern. *See Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (citing *Boals* [*v. Grey*, 775 F.2d 686, 693 (6th Cir. 1985)]); *Gregorich v. Lund*, 54 F.3d 410, 415-16 (7th Cir. 1995). Even intra-union disputes and "factional activity" can touch on matters of public concern under certain circumstances. *See Clue*, 179 F.3d at 61. However, not all speech relating to union activity is protected. *See Heil v. Santoro*, No. 94 Civ. 9109, 1997 WL 102451, *4 (S.D.N.Y. Feb. 28, 1997), *aff'd*, 147 F.3d 103 (2d Cir. 1998); *Boals*, 775 F.2d at 693. It is necessary to closely examine references to union activity and organization in order to determine whether the speech actually touches on a matter of public concern. *See Gregorich*, 54 F.3d at 415-16.

In essence, Plaintiff's position is that the sheep story is a form of didactic narrative aimed at establishing effective union representation and, therefore, it constitutes protected speech. According to Plaintiff, the sheep represent the drivers, who must unionize in order to protect themselves from the wolf, which represents management and others who oppose the drivers. Plaintiff recounted the sheep story nearly sixty times to different groups during different time periods. The Court received testimony about several versions of the sheep story that Plaintiff told on various occasions (to Tammy Duda in early 2003, Myron Sayre and David Toms in September 2003, Randy Agans on October 18, 2003, and Randy Agans and Linda Robinson on October 30, 2003). Based on the credible testimony, the meaning of the story changed dramatically along with the context, audience, and motive. However, the version of the sheep story that Ms. Robinson reported was the one that caused Dr. Martin to authorize the investigation and was the version Defendants ultimately considered inappropriate and disruptive; therefore, this is the only version relevant to the First Amendment retaliation issue. Although

-10-

some versions of the story may have contained a legitimate union-organizing message, the version of the story as Ms. Robinson related it did not.

Mr. Agans and Ms. Robinson both testified that Plaintiff's manner in telling the sheep story was intense and intimidating.  They believed that the story suggested physical violence against Ms. Clarke and others, and they did not perceive any union-organizing message.  Mr. Winslow, an experienced, independent investigator, concluded in his report to Defendant District that Mr. Agans and Ms. Robinson were not exaggerating their concern about the sheep story.  Once Mr. Winslow and Mr. Luke completed their interviews, they concluded that, although Plaintiff did not pose an immediate threat, his behavior was disruptive and could lead to future workplace violence.  Furthermore, Mr. Luke concluded that Plaintiff used the term "kill" when telling the sheep story.

Individuals often use poetic license to enhance speech; however, Plaintiff's use of the word "kill," coupled with his aggressive manner toward Mr. Agans and Ms. Robinson — who were associated with an opposing faction within the transportation department and with whom Plaintiff was not on friendly terms — was confrontational and menacing.  Although the sheep story cannot be considered "threatening speech" because any threat conveyed was neither unequivocal nor immediate, *cf. United States v. Malik*, 16 F.3d 45, 51 (2d Cir. 1994), it had the character of an interpersonal workplace dispute, not an attempt at labor organization.  Accordingly, the Court finds that Plaintiff's sheep story in that context was not protected and holds that Plaintiff has failed to prove a prima facie case for First Amendment retaliation based on his telling of the sheep story.

Furthermore, the Court finds that, even if the sheep story constituted protected speech, Plaintiff has not proven causation.  Defendants' purpose in investigating and suspending Plaintiff was to investigate a possible threat of violence and punish disruptive and untruthful behavior, not to suppress talk of unionization.[5]

C.     Other allegations

Plaintiff claims that Defendants took additional adverse employment actions against him in retaliation for his alleged attempts at labor organization.[6]  Specifically, he contends that a letter of reprimand, dated November 12, 2004, which cited a number of complaints against him by parents of children who were passengers on his bus routes, also constitutes an adverse employment action.  *See* Plaintiff's Exhibit "64."  On October 26, 2004, a parent filed a complaint with Defendants in connection with Plaintiff's school bus "jail time" and "marshal" safety and discipline programs.  *See* Plaintiff's Exhibit "64."  Ms. Clarke objected to these policies; and Joanne Swenson, the assistant superintendent for personnel, decided that Ms. Clarke should instruct Plaintiff to discontinue the programs.  *See* Tr. volume 5 at 52.  On March 11, 2004, another parent complained that Plaintiff scolded her daughter for arriving late at the bus stop and not sitting down fast enough.  *See* Plaintiff's Exhibit "64."  For this behavior as well

---

[5] The February 13, 2004 letter notifying Plaintiff of his suspension does not reference union activity or his PERB-hearing testimony.  It cites only his disruptive behavior, in the form of "[d]iscourteous treatment of the public," "inappropriate behavior as a representative of the District," and "unprofessional conduct or language."  *See* Plaintiff's Exhibit "44."  The letter also states that Plaintiff lied about using the word "kill."  *See id.*

[6] Plaintiff has not identified any other incidents of protected speech.  Therefore, the Court must assume he is claiming that his PERB-hearing testimony and his telling of the sheep story are the bases for these claims.

as for failing to follow Ms. Clarke's instructions to correct this behavior, Ms. Clarke issued Plaintiff the letter of reprimand.  *See id.*

Plaintiff also contends that Defendants' investigation of him concerning an argument he had with two co-workers on District property constituted an adverse employment action.  *See* Plaintiff's Exhibit "34."  Two female transportation department employees alleged that Plaintiff threatened and intimidated them on October 28, 2004, in the employee parking lot after work. *See* Plaintiff's Exhibit "34" at 2.  As a result of this complaint, Ms. Vaillancourt again hired Mr. Luke to investigate the allegations against Plaintiff.  *See* Tr. volume 4 at 114.  Mr. Luke concluded in a report, dated December 13, 2004, that all parties involved in the confrontation acted inappropriately but that Plaintiff was the "catalyst."  *See* Plaintiff's Exhibit "34" at 8. Citing the parental complaints and the parking lot incident, Ms. Vaillancourt issued Plaintiff a letter of reprimand, dated April 19, 2005, *see* Defendants' Exhibit "16"; however, Defendants did not take any further action.

Ms. Clarke conducted a number of counseling sessions with Plaintiff in fall 2004 concerning a complaint by Elizabeth Weaver, the mother of two students on Plaintiff's bus route. *See* Tr. volume 2 at 77-91.  Ms. Weaver had safety concerns about the location of her children's bus stop and claimed that Plaintiff was rude and demeaning toward her children.  *See* Defendants' Exhibit "19."  Ms. Weaver's complaints resulted in an investigation, which Plaintiff claims constitutes another adverse employment action.  On January 20, 2005, Ms. Clarke employed AMRIC to tail Plaintiff's bus and determine whether Plaintiff was discharging students from the bus in an inappropriate or unsafe manner.  *See* Plaintiff's Exhibit "106" at 3. AMRIC concluded that it did not observe any unsafe behavior.  *See id.* at 4.  Ms. Clarke also

-13-

employed Mr. Luke to investigate the Weaver complaints.  After conducting several interviews,

Mr. Luke concluded that Ms. Weaver's and the children's account of events were more credible

than Plaintiff's.  *See* Tr. volume 4 at 124-25.

Even assuming that Plaintiff could establish that he engaged in protected speech and that

these investigations and counseling memoranda constituted adverse employment actions, there is

no causal connection between the speech and these incidents.[7]  Defendants had legitimate cause

to investigate and counsel Plaintiff concerning the various complaints that parents and co-

workers leveled against him.  In light of the number and seriousness of complaints from different

sources as well as Plaintiff's history of confrontational behavior, it was reasonable and

appropriate for Defendants to investigate and counsel Plaintiff with respect to these incidents.

Indeed, Plaintiff acknowledged at trial that it would be appropriate for Defendants to investigate

the complaints against him if they found them to be credible.  *See* Tr. volume 2 at 142.  Based on

the credible testimony, the Court finds that, confronted with facially credible complaints against

Plaintiff, Defendants initiated the investigations solely for the purpose of discerning the truth of

those complaints.  The investigations themselves were conducted by outside consultants and

---

[7] Since the Court finds that Plaintiff has not demonstrated causation, it need not decide
whether these incidents constitute adverse employment actions.  However, counseling
memoranda, written reprimands, and investigations are not adverse actions absent accompanying
negative consequences, such as decrease in pay or probation.  *See Morrison v. Johnson*, No.
1:01-CV-636, 2006 WL 2811802, *15 (N.D.N.Y. Sept. 28, 2006) (citations omitted); *Uddin v.
City of N.Y.*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (citations omitted); *Anemone v. Metro.
Transp. Auth.*, 410 F. Supp. 2d 255, 266 (S.D.N.Y. 2006) (citations omitted); *cf. Weeks v. N.Y.*,
273 F.3d 76, 86 (2d Cir. 2001) (holding in employment discrimination context that counseling an
employee is not an adverse action).  Except for the sheep-story investigation, the accompanying
letter informing Plaintiff of his suspension, and the letter of reprimand, dated May 22, 2003,
which was referenced in the suspension letter, none of the other investigations, letters, or
counseling sessions resulted in any further disciplinary action.

followed standard procedures.  Based on the consultants' conclusions, Defendants determined that Plaintiff's conduct was inappropriate and counseled him in accordance with that determination.  However, the Court need not even go so far in order to reach the conclusion that these incidents did not amount to retaliation.  Even if Defendants' actions were unreasonable or unfair, Plaintiff's claims must fail because he has not demonstrated that his testimony or the sheep story was a "substantial factor" in the investigations and reprimands.

**D.     Pattern of harassment**

Plaintiff contends that all of the aforementioned incidents, taken over a period of time, constitute a pattern of ongoing harassment in retaliation for the sheep story and Plaintiff's PERB-hearing testimony.  A series of relatively minor incidents may constitute a pattern of harassment, but not if they are sporadic in nature, unrelated, and would not deter an individual of average firmness from exercising his right to free speech.  *See Phillips*, 278 F.3d at 109; *Uddin v. City of New York*, 427 F. Supp. 2d 414 (S.D.N.Y. 2006) (holding that denial of a choice of supervisor, denial of a desk with a telephone, negative memoranda by supervisors, counseling about client complaints, and charges of insubordination and misconduct were too causally and temporally unrelated to constitute a pattern of harassment).  Since the incidents in this case spanned a period of almost three years, were not causally related to one another, and were relatively minor in character, the Court finds that they do not constitute harassment.  *See Deters v. Lafuente*, 368 F.3d 185, 189 (2d Cir. 2004) (holding that a series of allegedly unwarranted accusals and counseling did not constitute harassment because they were infrequent and no one incident was particularly severe).  Moreover, these incidents would not have deterred a person of ordinary

-15-

firmness from speaking.  In fact, Plaintiff testified that he continued to tell the sheep story after

Defendants suspended him.  *See* Tr. volume 3 at 21-22.  Finally, as noted, Plaintiff has not

established causation regarding any of the incidents at issue.


### III. CONCLUSION

Based on the evidence adduced at trial and the applicable law and for the reasons stated

herein, the Court hereby

**ORDERS** that Plaintiff's federal and state free speech retaliation claims are

**DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court enter judgment in favor of Defendants and close

this case.


**IT IS SO ORDERED.**


Dated: February 29, 2008

Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge